IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIBERTY INSURANCE UNDERWRITERS, INC. | § § § | |
| Plaintiff, | § § | CIVIL ACTION NO.: |
| VS. | § § | |
| TEXAS BRINE COMPANY, LLC and OCCIDENTAL CHEMICAL CORPORATION | § § § | JUDGE: |
| | § § | |
| Defendant. | § | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Liberty Insurance Underwriters Inc. ("LIU") brings this action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 for the purpose of determining questions of actual controversy between it and its insured, Texas Brine Company LLC, individually and as successor to Texas Brine Corporation ("Texas Brine"), and Occidental Chemical Corporation ("OCC"), who alleges that it is an additional insured under a policy of insurance issued to Texas Brine. The controversy arises out of Texas Brine's claims seeking coverage for alleged loss and damage claims asserted in multiple cases and administrative proceedings. The litigation and proceedings arise out of activities at Oxy Geismar #3, a brine production well, in Assumption Parish, Louisiana, allegedly resulting in a sinkhole and other damages, including the release of pollutants, irritants, and/or contaminants, including but not limited to brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others.

**PARTIES**

1.  Plaintiff, LIU, is an Illinois corporation with its principal place of business in Boston, Massachusetts.

2.  Defendant Texas Brine is a Texas corporation with its principal place of business in Houston, Texas.

3.  Defendant OCC is a New York corporation with its principal place of business in Dallas, Texas.

**JURISDICTION AND VENUE**

4.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.  This Court has personal jurisdiction over Texas Brine and OCC because they do business within the state of Texas.

6.  This Court is a proper venue under 28 U.S.C. § 1391 as Texas Brine resides in Houston, Texas.

7.  Application of Texas law is proper under Article 21.42 of the Texas Insurance Code.

**FACTS**

8.  Since 2001, LIU has issued commercial excess insurance policies to Texas Brine on an annual basis.

9.  In particular, LIU issued commercial excess policy No. EXCSF183721-8 to Texas Brine for the period March 1, 2012 to March 1, 2013 ("LIU Excess Policy"). Subject to all terms, conditions, and exclusions, the LIU Excess Policy provides $50 million of insurance

coverage above $75,000,000 of other excess insurance.  The LIU Excess Policy, like the other policies, was issued to Texas Brine in Texas, and contains certain Texas notices and endorsements.

10.  The LIU Excess Policy follows form to the underlying insurance policies subject to the LIU Excess Policy's own terms, conditions, and exclusions.  LIU Excess Policy, p. 1 ("Except for any definitions, terms, conditions and exclusions of this policy, the coverage provided by this policy is subject to the terms and conditions of the First Underlying Insurance Policy. . . .").

11.  The LIU Excess Policy includes a schedule of underlying insurance, which identifies, among other things, the First Underlying Policy as American Guarantee & Liability Insurance Company's policy No. UMB-9379002-08 ("First Underlying Policy").  The First Underlying Policy's Coverage A – Excess Follow Form Liability Insurance, adopts the terms and conditions of the underlying insurance, which includes Zurich American Insurance Company's commercial policy No. GLO 9382139-03 ("Zurich Primary Policy").  Except for any particular definitions, terms, conditions, or exclusions, the LIU Excess Policy is subject to the terms and conditions of the First Underlying Policy and the Zurich Primary Policy issued to Texas Brine.  LIU Excess Policy, p. 1.

12.  Since at least the 1970's, Texas Brine or its predecessor in interest has been in the business of salt production, including the treatment and transportation of brine, in Assumption Parish, Louisiana.

13.  On July 18, 1975, Texas Brine or its predecessor in interest entered into a Salt Lease (Amended and Restated) ("Salt Lease") with Hooker Chemical Company, predecessor to OCC. Under the Salt Lease, Texas Brine has the right to extract salt and salt brine from a portion of property owned by OCC located in Section 40 of Township 12 South, Range 13 East in Assumption Parish, Louisiana (the "Property"), beneath which a portion of the Napoleonville Salt Dome (the "salt dome") lies.

14.  Texas Brine or its predecessor in interest entered into a Construction Contract and Facilities Lease with Vulcan Materials Company ("Vulcan") on October 29, 1975, and subsequently assigned its rights under the Salt Lease to Vulcan on October 27, 1976.

15.  Texas Brine or its predecessor in interest also entered into an Operating and Supply Agreement ("Operating Agreement") with Vulcan Materials Company ("Vulcan") on October 29, 1975.  Under the Operating Agreement, Texas Brine agreed to "operate for the account of Vulcan all of the leased facilities, as well as facilities owned by Vulcan and acquired hereunder . . . for and during the full term of said lease, and shall produce and deliver for the account of Vulcan from such facilities to Vulcan at Geismar, Louisiana, salt in the form of brine in accordance with the terms of this Agreement."   This agreement was extended in an Amended and Restated Operating and Supply Agreement ("Amended Operating Agreement"), executed on January 1, 2000 between Texas Brine and Vulcan.

16.  Section 12.4 of the Amended Operating Agreement sets forth Texas Brine's obligation to take out and maintain liability insurance, including commercial general liability insurance with limits of $5,000,000, and states "[t]he policy or policies of insurance required

under Sections 12.4(c) and 12.4(d) hereof shall name Vulcan as an additional insured, and the commercial general liability insurance required under Section 12.4(d) hereof shall be primary as to any insurance or self-insurance programs of Vulcan."

17.   At some point subsequent to the execution of the Amended and Restated Operating Agreement, Vulcan assigned its rights in the Salt Lease to Basic Chemical Company, LLC ("Basic").  Basic, in turn, assigned its rights to Occidental VCM, LLC ("Occidental VCM") in December 2006.

18.   Texas Brine or its predecessor in interest has continuously operated the brine mining facilities on the Property since the inception of the Salt Lease in 1975, first under the Operating Agreement and later under the Amended and Restated Operating Agreement.

19.   Over the course of its business, Texas Brine drilled and operated Oxy Geismar #3, a brine production well.  Texas Brine's conduct allegedly caused Oxy Geismar #3 to become structurally unstable and ultimately to collapse, leading to the creation of a sinkhole and other resulting damages, including but not limited to the release of brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others, all impacting residences, businesses, natural resources and waters of the State, and so on.

20.   As early as the fall of 1976, Texas Brine understood it potentially could be drilling wells close to the salt dome's edge.  The first mine it attempted to drill on the Property in August 1976 hit non-salt material at 3,680 feet deep.  Thereafter, Texas Brine retained consultants to assist it in mapping the geological contours of the salt dome.  The consultant, Hoz & Associates, noted that the Property was in the extreme northwest corner of the salt dome, and that "even if

further wells on this tract remain in salt to the proposed total depth [of 7,000 feet], their proximity to the steep dipping salt dome cap rock could limit the volume of salt that could be recovered from the well." Hoz & Associates also noted that "drilling of further tests . . . with the objective of getting into salt above 1000' and staying in salt to 7000', would certainly be risky," and concluded that "the risks discussed above may not be justified by the economic guidelines within which [Texas Brine has] to operate."

21.  In February and March 1982, Texas Brine and Vulcan discussed the depth to which the well that would soon become Oxy Geismar #3 should be drilled.  Vulcan suggested a well depth of 5,000 feet because, among other things, "the uncertain location of the dome edge leads us to consider a shallower well than what was originally proposed."  Texas Brine countered with a recommendation that the well be drilled to 6,000 feet.

22.  The Louisiana State Department of Natural Resources ("DNR") granted Texas Brine permission to drill Oxy Geismar #3 on April 15, 1982, with the permit allowing drilling to a depth of 6,040 feet.  Texas Brine completed construction of the well and brine production began on July 8, 1982.  The depth of the well at that time was 5,918 feet.

23.  On August 25, 1995, Texas Brine sought permission from the Louisiana Department of Natural Resources ("DNR") to pump into Oxy Geismar #3 Naturally Occurring Radioactive Material ("NORM") that had accumulated in scales over the years and had been found in soils near the well.  On August 31, 1995, the DNR gave permission to Texas Brine.  Texas Brine then allegedly pumped NORM into Oxy Geismar #3.

24.  In 1998, Vulcan hired RE/SPEC Inc. ("RE/SPEC"), an engineering company, to

evaluate the salt reserves on the Property as well as the proximity of Oxy Geismar #3 to the salt dome's edge.  In examining a map of the overhang of the salt dome prepared by Texas Brine, RE/SPEC noted that, if the map was correct, "the floor of the cavern at 5,700 foot depth is precariously near the edge of the salt at the present time."  To reduce the potential for decreasing the thickness of salt between the cavern and the edge of the salt dome, RE/SPEC suggested changing the height of active mining in the cavern to 5,000 feet.  It also suggested locating the roof of the existing caverns at 1,500 feet.  The RE/SPEC report further noted that gas had been intruding into Oxy Geismar #3 since development began, and the continued gas production associated with brine mining in the well also raised concerns that the well was near to the edge of the salt dome, or had intersected a non-salt unit that, in turn, intersected with the edge of the dome.

25.  A March 30, 1998 Texas Brine internal memorandum responding to RE/SPEC's suggestions noted, with respect to the idea of raising the roofs of the existing caverns to 1,500 feet, that reducing the distance between the top of the salt and the roof of the cavern "increases the risk of possible subsidence."  Regarding the proximity of Oxy Geismar #3 to the edge of the salt dome, the memo noted that "admittedly the conservative interpretation we have developed does show that the bottom of the existing No. 3 cavern could be relatively close to the end of salt."  It contemplated moving the tubing string higher in the cavern to avoid the potential problem.  The memo's author concludes by noting his discomfort with raising the level of the cavern roofs while increasing the diameters of the caverns and decreasing the salt web thickness, stating "[i]f we get greedy on our salt extraction and cause a subsidence event we could possible

[sic] trigger a larger event which could, in turn, cause a problem on adjoining leases . . . .  With storage in the wells directly to our east we could cause a disaster."  Indeed, Texas Brine had seen such disastrous problems before: "I must bring to mind what happened at the Azko mine in New York when they got greedy with their salt recovery = subsidence, loss of the mine, disastrous surface damage, tremendous legal actions, closer [sic] of operations and eventual sale of company."

26.   Nine years later, in October 2007, Texas Brine raised the tubing string and began mining from a depth of 5,194 feet.  It also began discussing the possibility of raising the roof of the cavern to a depth of 2,100 feet to further develop the cavern.

27.   Even as it made these changes, Texas Brine was aware of the consequences that could result from its brine mining operations.  In a June 4, 2008 presentation given to Occidental and Texas Brine representatives entitled "OXY Napoleonville Brine Well Options," PB Energy Storage Services, Inc. noted that "gradual subsidence" including "oil and gas withdrawal," as well as "sinkholes," were potential ground movements over salt domes.  It likewise warned that subsidence rates would more than double with new cavern roofs at 1,500 feet.  An August 27, 2008 email exchange between Texas Brine employees noted that there was "value in not abandoning [Oxy Geismar #3]," but also recognized "the risk if the cavern leaches out into the surrounding sediments," and that while "it would not be the same magnitude as the Gulf South situation, it probably would not be well received by DNR."

28.   On information and belief, Texas Brine ceased mining operations in Oxy Geismar #3 in May 2009.

29.   In April 2010, Texas Brine requested a permit from DNR to raise the top of Oxy Geismar #3 cavern to 2,100 feet to recover additional salt reserves from the well, as had been discussed as early as 1998, and return it to active mining operation.   The DNR approved the permit on May 4, 2010, requiring Texas Brine first to perform a Mechanical Integrity Test ("MIT") of the well.

30.   On January 21, 2011, Texas Brine notified the DNR that the MIT of Oxy Geismar #3 had failed, indicating that the well lacked sufficient integrity for continued salt extraction and/or production, and that a breach of the salt dome appeared possible.   These problems purportedly led Texas Brine to plug and abandon Oxy Geismar #3 in June 2011.   On information and belief, it performed no further monitoring of the well after that time.

31.   Starting in late May and throughout the summer 2012, residents reported bubbles appearing in the Bayou Corne area, and claim to have experienced odd industrial odors and seismic activity around their property.

32.   On June 19, 2012, the Assumption Parish Policy Jury declared a State of Emergency following "danger due to natural gas being released into Bayou Corne on May 30, 2012," which "poses immediate danger to the residents in the parish of Assumption."

33.   A sinkhole releasing gas and other pollutants was discovered on August 3, 2012. Later that day, the DNR declared a State of Emergency.   The DNR ordered Texas Brine to take specific steps to protect public safety.

34.   On the same day, August 3, 2012, the Assumption Parish Police Jury ordered a mandatory evacuation "from the home of Randy Rousseau south to all residents within the

Bayou Corne community." The order remains in place. However, on information and belief, no structural damage to houses or buildings has resulted from the sinkhole, although portions of certain pipelines have sunk.

35. On information and belief, the sinkhole was caused by a breach of the western side wall of the Oxy Geismar #3 cavern.

36. On information and belief, the cavern failed at a depth somewhere between 5700 and 5800 feet.

37. Texas Brine gave preliminary notice to LIU (and other insurers) on approximately August 6, 2012.

38. On August 9, 2012, the DNR reported the "contents within the area of subsidence/sinkhole were determined to contain both diesel and elevated chlorides." The DNR also found evidence of "bubbling . . . within the area of the subsidence/sinkhole and bubbling within the waters of the surrounding area." The DNR ordered Texas Brine to take specific steps to protect public safety.

39. On September 13, 2012, the Louisiana Department of Health and Hospitals, after reviewing information from the DEQ, issued a letter detailing the "high levels of methane found in industrial water wells in the area."

40. On September 14, 2012, the DNR reported "high levels of methane" in certain areas which could "threaten lives, the environment, property and operations, sites and facilities." The DNR also reported "continuous bubbling of natural gas in the Bayou Corne area with several

additional bubbling sites being discovered." The DNR ordered Texas Brine to take specific steps to protect public safety.

41. On October 16, 2012, the DNR reported on the "bubble sites in the vicinity of the cavern," finding that the "gas has all of the characteristics of natural gas," and "the hydrocarbon fluid appears to be crude oil." The DNR also noted that "additional crude oil or natural gas migration appears possible." The DNR ordered Texas Brine to take specific steps to protect public safety.

42. On November 12, 2012, the DNR reported a "potential danger to human life associated with [certain] gas pressures," and ordered Texas Brine "to undertake any and all necessary actions to assess for and abate threats to safety and the environment, including the abatement of natural gas accumulation in the aquifer and aquitard."

43. On November 21, 2012, the DNR wrote a letter to Texas Brine, stating that an on-site crew "smelled a sulfur-like odor coming from the water tank," and then "confirmed the presence of hydrogen sulfide."

44. On December 7, 2012, the DNR reported "an increase in chlorides at nearby industrial water wells operated by Texas Brine. . .and an increase in chlorides and total dissolved solids with depth in the sinkhole" based upon "recent groundwater and sinkhole surface water sample results." The DNR ordered Texas Brine to take specific steps to protect public safety.

45. Additional reports from the DNR followed, ordering Texas Brine to conduct gas and water sampling, among other things, in the interest of public safety.

46.   On July 12, 2013, the DNR reported that the Blue Ribbon Commission on Bayou Corne and Grand Bayou Public Safety has "recommended that reducing and maintaining methane gas formation pressures in the [Mississippi River Alluvial Aquifer] to equal to hydrostatic pressure across the Bayou Corne gas area is one metric necessary to meet regarding the benchmarks associated with the mandatory evacuation order currently in effect."  The DNR ordered Texas Brine to take specific steps to protect public safety, including but not limited to water sampling, sub-slab differential pressure monitoring, multiphase flow gas and soil sampling

47.   Numerous lawsuits and administrative proceedings have been commenced against Texas Brine.   As a result, Texas Brine has incurred and will continue to incur significant liabilities in connection with the sinkhole and other resulting damages allegedly arising out of its activities at Oxy Geismar #3.  These liabilities include but are not limited to clean-up costs for pollutants and liabilities for alleged damages to third parties (including individuals, businesses, and governmental entities) whose persons or property have been or will be impacted by the sinkhole and other resulting damages, including but not limited to the release of brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, NORM, and others.

48.   Certain lawsuits have been brought by homeowners and pipeline companies, among others, claiming that Texas Brine's negligent operation and management caused the collapse of Oxy Geismar #3 and the sinkhole, and resulting property damage and lost profits, including contamination from brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others, as well as NORM, and fear, aggravation, and inconvenience in the

community, and even injury from diesel odors and unidentified harmful substances in the air, among other things.  The lawsuits are pending in Louisiana state and federal courts.

49.   The DNR and/or other state agencies have requested reimbursement from Texas Brine and filed a lawsuit in Louisiana state court against Texas Brine for certain costs and expenses relating to remediation and clean-up of pollutants in and around the sinkhole and surrounding area, particularly regarding the release of brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others.

50.   The Assumption Parish Police Jury and the Assumption Parish Sheriff's Office have each filed lawsuits to recoup costs associated with their respective emergency and other response efforts associated with the formation of the sinkhole and the subsequent evacuation of nearby communities.

51.   Texas Brine seeks recovery of its liabilities from insurers, including LIU.  In addition to third party claims, Texas Brine has submitted to LIU and other insurers a non-descript spreadsheet seeking reimbursement of tens of millions of dollars for unknown committed monies and/or expenditures.  LIU has requested additional information regarding the spreadsheet, but it has not been provided to date.  It is believed the spreadsheet includes remediation and clean-up costs for, among other things, brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others.

### THE POLICIES PRECLUDE COVERAGE FOR DAMAGES CLAIMED BY AND AGAINST TEXAS BRINE *POLLUTION EXCLUSION*

52.   Texas Brine has sought coverage under the LIU Excess Policy for losses arising from, among other things, the actual or threatened release of pollutants, demands for testing and removal of such pollutants, and amounts incurred by the DNR and other state and parish agencies for response costs, including testing and removal of such pollutants.

53.   There is no coverage to the extent any loss or damage relates to pollutants.

54.   The LIU Excess Policy contains a Pollution Limitation Endorsement No. 4, which provides in part:

This insurance does not apply to:

Any "loss," including but not limited to settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants, arising out of or in any way related to:

> 1.     The actual, alleged, or threatened presence, discharge, seepage, migration, release, or escape of "pollutants," however caused.

> 2.     Any request, demand, or order that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants."  This includes demands, directives, complaints, suits, orders or requests brought by any governmental entity or by any person or group of persons.

> 3.     Steps taken or amounts incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or assess the effects of "pollutants."

This exclusion will apply to any "loss," costs, charges, or expenses, or any judgments or settlements, arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable.

As used in this exclusion, "pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant, including, but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials, which are intended to be or have been recycled, reconditioned or reclaimed.

However, it is agreed that this exclusion does not apply to any "loss" described above for which coverage is afforded under American Guarantee & Liability Insurance Co. Policy No. UMB-9379002-08 . . . and then for no broader coverage than is afforded by such insurance.

55.   Accordingly, the pollution exclusion in the LIU Excess Policy bars any claims for loss or damage due to any contamination by NORM, brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, or others, including but not limited to the costs to respond to and comply with the DNR's and/or other parish and state agency's clean-up and remediation directives, orders, and costs.

56.   The LIU Excess Policy, as set forth above, provides that its pollution exclusion does not apply to any loss for which coverage is afforded under the First Underlying Policy.  The First Underlying Policy contains limited pollution coverage, as set forh in an Absolute Pollution Exclusion Endorsement with Blended Discovery and Reported Provisions, and provides in part:

B.   Under **Coverages A** and **B,** the policy does not apply to any liability, damage, **loss** or expense:

1.   Arising directly or indirectly out of an actual, alleged or threatened existence, discharge, dispersal, seepage, migration, release or escape of **pollutants**;

2.   Arising out of any:

a.   Request, demand or order that any **insured** or others test for, monitor, clean-up, remove,

contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

b.      Claim or **suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

3.  Paragraph **B.1.** and **B.2.a.** of this endorsement does not apply to **bodily injury** or **property damage**:

a.      . . . .

b.      . . . .

c.      Directly caused by any discharge, dispersal, seepage, migration, release or escape of **pollutants** that:

1.  Is instantaneous and demonstrable as having first commenced at a specific time and day during the policy period of this policy;

2.  Is accidental and neither expected nor intended from the standpoint of any **insured**;

3.  Is first discovered by any **insured** within **seventy-two (72) hours** of its first commencement; and

4.  Is reported to us by you no later than **thirty (30) days** following the first discovery by any **insured**.

4.  The coverage afforded under Paragraph **B.3.** of this endorsement does not apply to any liability, damage, **loss**, cost or expenses arising out of:

a.      . . .

b.      Any discharge, dispersal, seepage, migration, release or escape of **pollutants** which takes place on, at or from any site, premises or location:

1.  . . .

2.  . . .

3.  At which the usual or routine conduct of any **insured's** business has been terminated or suspended or which any insured has sold, given away or abandoned; . . . .

57. The exception in the First Underlying Policy does not apply. Gas bubbling allegedly began on or around May 30, 2012, but Texas Brine did not notify any insurer until August 6, 2012, more than 30 days later. In addition, the limited coverage does not apply to any discharge, dispersal, escape, and the like where the insured's business has been terminated or suspended, or which the insured has sold, given away, or abandoned. Here, because Texas Brine plugged and abandoned Oxy Geismar #3 in 2011, long before the bubbling began and the sinkhole developed, there is no coverage.

### *RADIOACTIVE MATTER EXCLUSION*

58. Texas Brine has sought coverage under the LIU Excess Policy for losses arising from, among other things, any actual or threatened contamination by, or pathogenic, toxic or other harmful or hazardous properties of, any radioactive material.

59. There is no coverage to the extent any loss or damage relates to radioactive materials.

60. The First Underlying Policy contains a Radioactive Matter Exclusion Endorsement, which is incorporated into the LIU Excess Policy. The Endorsement provides that there is no coverage for:

> A. Any liability, damage, loss, cost or expense arising out of the actual, alleged or threatened contamination by, or pathogenic, toxic or other harmful or hazardous properties of, any radioactive material;
>
> B. Any loss, cost or expense arising out of any:
>
> > **1.** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any radioactive material; or

> **2.**      Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, radioactive material.

61.   Texas Brine, with the permission of the DNR, allegedly dumped NORM into Oxy Geismar #3.   The lawsuits claim damages because of the storage and/or contamination of NORM, as well as brine, diesel, chlorides, hydrogen sulfide, methane or natural gas, hydrocarbons, and others.   To the extent Texas Brine is liable for any damages because of NORM or other harmful materials, there is no coverage.   Nor is there coverage for any costs expended by Texas Brine to respond to and comply with the DNR's or any other state or parish agency's clean-up and remediation directives, orders, and costs.

### *KNOWN LOSS EXCLUSION*

62.   Texas Brine has sought coverage under the LIU Excess Policy for losses about which it had knowledge prior to the policy period.

63.   There is no coverage to the extent any loss or damage was known to have occurred or begun to occur before the policy period.

64.    The First Underlying Policy contains a "Known Loss" Exclusion, which is incorporated into the LIU Excess Policy.   The policy language provides:

> The insurance afforded under **Coverage A** and/or **Coverage B** applies to **bodily injury** or **property damage** only if prior to the policy period, no **designated insured** knew that the **bodily injury** or **property damage** had occurred, in whole or in part.   If such a **designated insured** knew, prior to the policy period, that the **bodily injury** or **property damage** occurred, then any continuation, change or resumption of such **bodily injury** or **property damage** during or after the policy period will be deemed to have been known prior to the policy period.

> **Bodily injury** or **property damage** which occurs during the policy period and was not, prior to the policy period, known to have occurred by any **designated insured** includes any continuation, change or resumption of that **bodily injury** or **property damage** after the policy period; and
>
> **Bodily injury** or **property damage** will be deemed to have been known to have occurred at the earliest time when any **designated insured**:
> > **1.** Reports all, or any part, of the **bodily injury** or **property damage** to us or any other insurer;
> > **2.** Receives a written or verbal demand or claim for damages because of the **bodily injury** or **property damage**; or
> > **3.** Becomes aware by any other means that **bodily injury** or **property damage** has occurred or has begun to occur.

65.   Texas Brine knew in 1998 that the western wall of Oxy Geismar #3 was already "precariously" close to the edge of the salt dome, and that to continue increasing the level of salt reserves mined could "cause a disaster."  It nonetheless continued mining operations at the well until May 2009, and was attempting to increase the roof level of the salt cavern in 2010 to resume operations when the MIT indicated the well lacked integrity and should no longer be mined.

66.   On information and belief, the collapse of the western side wall of the cavern caused and/or contributed to the sinkhole forming in August 2012, realizing Texas Brine's predictions of "disaster."  Accordingly, to the extent that Texas Brine is liable for bodily injury or property damage resulting from the sinkhole incident, there is no coverage.

### *INTENTIONAL INJURY EXCLUSION*

67.   Texas Brine has sought coverage under the LIU Excess Policy for losses which it expected or intended to occur.

68. There is no coverage to the extent any loss or damage was expected or intended by Texas Brine.

69. The First Underlying Policy contains an "Intentional Injury" Exclusion, which is incorporated into the LIU Excess Policy.  The policy language provides:

> Under **Coverage B**, this policy does not apply to . . . **Bodily Injury** or **property damage** expected or intended from the standpoint of the **insured**.

70. For the reasons stated above with regard to the Known Loss Exclusion and also applicable to the Intentional Injury Exclusion, to the extent Texas Brine is liable for bodily injury or property damage resulting from the sinkhole incident, there is no coverage.

### *CARE, CUSTODY, OR CONTROL EXCLUSION*

71. Texas Brine has sought coverage under the LIU Excess Policy for losses associated with damage to property within its care, custody, and control.

72. There is no coverage to the extent any loss or damage was to property in Texas Brine's care, custody or control.

73. The LIU Excess Policy contains a Care, Custody, or Control Exclusion.  The policy language provides:

> This insurance does not apply to . . . Any "loss" for property damage to real or personal property in the care, custody or control of any Insured, or loaned to any Insured, or used, rented or occupied by any Insured, or as to which any Insured is for any purpose exercising physical control.

74. Texas Brine has continuously operated the brine mining facilities on the Property since the inception of the Salt Lease in 1975.  To the extent Texas Brine is liable for property

damage to property under its care, custody, or control, including but not limited to clean-up and remediation costs of the site of the sinkhole incident itself, there is no coverage.

### CERTAIN PIPELINE CLAIMS EXCLUDED

75.   Certain pipeline companies, specifically Crosstex Energy Services L.P. and its affiliates, Acadian Gas Pipeline System and its affiliates, and Florida Gas Transmission Company LLC (collectively, "pipeline companies"), have made claims and filed lawsuits in Louisiana state court against Texas Brine seeking, among other things, physical damage to certain  portions of their pipelines, re-routing certain portions of their pipelines, lost profits and revenue, and business interruption resulting from the sinkhole.

76.   The LIU Excess Policy, in pertinent part, covers "property damage" as defined as "(a) physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the occurrence that caused it."  First Underlying Policy, p. 13.

77.   Economic losses that are not tied to either: (a) physical injury to tangible property, or (b) loss of use of tangible property that is not physically injured, are not "property damage."  As a result, they are not covered under the LIU Excess Policy.

78.   Certain pipeline companies have claimed economic losses associated with business interruption and the re-routing of their respective pipelines.  Economic losses such as business interruption costs and costs of creating new pipeline routes are not "property damage" and thus are not covered under the LIU Excess Policy.

79.   Moreover, at least one pipeline company has claimed it intends to abandon its pipeline following the sinkhole incident, and seeks damages from Texas Brine for the cost of such abandonment.

80.   There is no coverage under the LIU Excess Policy unless there is an "occurrence," which is defined in pertinent part as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  First Underlying Policy, p. 13.

81.   Abandonment costs are not an "accident."  They are part of the cost of doing business.  Accordingly, they are not a covered loss under the LIU Excess Policy.

## OCC IS NOT AN ADDITIONAL INSURED UNDER THE LIU EXCESS POLICY

82.   LIU repeats and re-alleges all allegations in their entirety.  All prior allegations and arguments are adopted against OCC.

83.   OCC alleges that it is entitled to additional insured status under the LIU Excess Policy as the assignee of Vulcan's indemnification rights under the Amended Operating Agreement.

84.   The indemnification provision in the Amended Operating and Supply Agreement provides that Texas Brine take out "commercial general liability insurance with limits of $5,000,000, combined single limit, including contractual liability coverage which shall specifically cover the indemnity of this Agreement. . . ."

85.   The Zurich Primary Policy contains an Additional Insured Endorsement, which states, in relevant part, that "[w]e will not provide Limits of Insurance to any additional insured person or organization that exceed the lower of: (a) the Limits of Insurance provided to you in

this policy; or (b) the Limits of Insurance you are required to provide in the written contract or written agreement."

86.    To the extent OCC qualifies as an additional insured under Texas Brine's commercial general liability policies, it is entitled to no more than the limit of insurance of $5,000,000 set forth in the Amended Operating Agreement.   On information and belief, that $5,000,000 limit already has been exhausted through payments from Zurich and/or other carriers higher in the policy tower than LIU.   Alternatively, if the $5,000,000 limit has not exhausted, then other carriers – and not LIU – are obligated to pay that amount to OCC.

87.   Accordingly, OCC is precluded from coverage under the LIU Excess Policy as an additional insured.

88.   Other terms, conditions, limitations, and exclusions of the LIU Excess Policy may preclude coverage to Texas Brine and/or OCC in connection with the liabilities in question.

89.   LIU pleads all other conditions, terms, limitations, definitions, and exclusions of those policies which may be found to be applicable as its investigation continues, and LIU reserves the right to amend this pleading as additional and/or more information becomes available.

90.   OCC has no rights under the LIU Excess Policy because any alleged coverage in favor of OCC is barred by the Louisiana Oilfield Anti- Indemnity Act.

**WHEREFORE**, Liberty Insurance Underwriters Inc. asks that Texas Brine Corporation and Occidental Chemical Corporation be cited and required to appear herein and that the Court:

(1) declare that LIU has no duty to defend or indemnity Texas Brine for any loss or damage arising out of Texas Brine's activities allegedly causing the sinkhole and its aftermath;

(2) declare that Occidental Chemical Corporation is not an additional insured under the LIU Excess Policy and that Occidental Chemical Corporation has no rights under the LIU Excess Policy; and

(3) award all other just and equitable relief to which LIU is entitled.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS,  L.L.P.

By:____/s/ Brian S. Martin_____  _____
    BRIAN S. MARTIN
      State Bar No. 13055350
      S.D. Texas No. 8823
      E-mail:  bmartin@thompsoncoe.com
    KEVIN F. RISLEY
      State Bar No. 16941200
      S.D. Texas No. 3491
      E-Mail:  krisley@thompsoncoe.com
    RODRIGO GARCIA, JR.
      State Bar No. 00793778
      S.D. Texas No. 782726
      E-Mail:  dgarcia@thompsoncoe.com
    One Riverway, Suite 1400
    Houston, Texas  77056
    Telephone:  (713) 403-8210
    Telecopy:  (713) 403-8299

*Attorneys for Liberty Insurance Underwriters Inc.*